FILED

JUL 29 2014

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANTHONY MELENDEZ,<br><br>　　　Petitioner,<br><br>　v.<br><br>OFFICER J. SOTO,<br><br>　　　Respondent. | No. C 12-05413 EJD (PR)<br><br>**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY** |

Petitioner has filed a pro se petition for a writ of habeas corpus under 28 U.S.C. § 2254 challenging his sentence for a state conviction. For the reasons set forth below, the Petition for a Writ of Habeas Corpus is **DENIED**.

### BACKGROUND

Petitioner pleaded guilty to first degree robbery in concert and kidnapping to commit robbery. The remaining 11 counts were dismissed, and included the following: another count of first degree robbery in concert, burglary, assault with a stun gun, assault with great bodily injury, assault with a firearm, four counts of false imprisonment, and two counts of child endangerment, plus enhancements for being armed with a handgun and two prior strikes. (Ans. Ex. 6 at 1.) Petitioner was

sentenced to state prison to the upper term of nine years for the robbery, and a consecutive term of seven years to life for the kidnapping, for an aggregate term of 16 years to life on June 18, 2010.

Petitioner appealed his conviction. The California Court of Appeal affirmed the judgment on August 18, 2011. (Ans. Ex. 6.) The California Supreme Court denied review on October 26, 2011. (Id., Exs. 7, 8.)

Petitioner filed the instant federal habeas petition on October 19, 2012.

## FACTUAL BACKGROUND

The California Court of Appeal summarized the facts as follows:

> This case is one of two before us arising from the same home invasion robbery targeting money linked to the marijuana trade in Laytonville. A group of at least five men, some wearing masks, entered the home of a marijuana grower, located on an isolated 40-acre plot of land, with the intent to rob him of cash they believed he had. Also at home were his wife and two children, ages six and two. The men bound the husband with zip ties, then one man—called "gold shirt" in the transcripts—sat on him while the others looted the house. Gold shirt was not wearing a mask and was ultimately identified by the marijuana grower as [Petitioner] Melendez.
>
> The men tried to get the husband to disclose the location of the money by beating him, pulling down his pants and sticking a fork between his buttocks, poking him behind the ear with the fork, threatening to shoot him in the kneecap with a gun, telling him they had a silencer and "no one is going to hear it," and using a Taser stun gun on him. They also tried to get the wife to cooperate by pulling her hair and threatening her with a Taser while her small children stood nearby.
>
> The husband finally told them the money was hidden half a mile away. Three of the men began walking him toward the money in his stocking feet, with temperatures in the 30's and sleet on the ground, while the other men stayed behind to guard the wife and children. [Petitioner] was identified by the husband as one of the men who took him out of the house. The three men soon decided the husband was lying about the location of the money and walked him back to his house.
>
> They then took him in his wife's car to an area where he directed them, parked the car and walked him over to a tree stump he pointed out as containing the money. This required him to walk over a slippery makeshift single-beam bridge, where he feared falling into the rocky creek six to eight feet below. The men found the money hidden in the tree stump in a military ammunition box and a black

plastic sewer pipe.

    The men then brought the husband back to the house, threatened him further if he went to the police, bound his wife into a chair, barricaded the children in the bathroom, and attempted to bind the husband in a way that would prevent him from easily extricating himself. They further ransacked the house, then took off in the husband's pickup truck and the wife's car.

    The husband managed to free himself and his wife, then drove an ATV down to his brother-in-law's house on the edge of his property. Someone in the brother-in-law's house had seen two suspicious looking cars parked nearby and described the cars to the victim.

    The victim and the others from his brother-in-law's house drove toward Highway 101. They found the family's two empty vehicles along the road with the doors wide open. Driving down Highway 101, they looked for the cars the friend had seen. They came up behind a green GMC Envoy, which they believed the robbers were driving. They began to pursue the Envoy and simultaneously called 911 to report the robbery.

    Sheriff and CHP officers joined in the pursuit of the Envoy, taking the lead. The officers pulled over the Envoy, but as they approached the car it pulled off again. They resumed pursuit, and after a 40-mile chase, sometimes at high speeds, they stopped it with a spike strip and apprehended the three occupants.

    The male victim, who broke off pursuit after the first car stop, went to the sheriff's station and identified, positively or tentatively, photographs of two of the five men involved in the crimes. He later identified [Petitioner] as one of the men who had actively participated in trying to get him to divulge the location of the cash and one who had taken him from the house to the tree stump. He claimed [Petitioner] was the man referred to in the transcripts as "gold shirt," who acted in a lead role during the robbery and kidnapping. The other defendants also identified Melendez as the one who made the decisions. [Petitioner] denied he was "gold shirt" at the time he entered his plea but admitted participating in the crimes.

    The police recovered from the Envoy and its occupants a total of $37,734, as well as televisions, jewelry, a video game console, video games, compact discs, a camera, and other electronic equipment taken from the marijuana grower's home. A handgun was also found on a freeway exit that had been taken by the Envoy at one point during the pursuit.

    [Petitioner] was not in the Envoy and was not arrested until some 21 months later, having been identified by a co-defendant and the husband as one of the robbers.

(Ans. Ex. 6 at 2-4, footnote omitted.)

# DISCUSSION

## I. Standard of Review

This Court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The writ may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 412-13 (2000). The only definitive source of clearly established federal law under 28 U.S.C. § 2254(d) is in the holdings (as opposed to the dicta) of the Supreme Court as of the time of the state court decision. Williams, 529 U.S. at 412; Brewer v. Hall, 378 F.3d 952, 955 (9th Cir. 2004). While circuit law may be "persuasive authority" for purposes of determining whether a state court decision is an unreasonable application of Supreme Court precedent, only the Supreme Court's holdings are binding on the state courts and only those holdings need be "reasonably" applied. Clark v. Murphy, 331 F.3d 1062, 1069 (9th Cir.), overruled on other grounds by Lockyer v. Andrade, 538 U.S. 63 (2003).

"Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts

of the prisoner's case." Williams, 529 U.S. at 413. "Under § 2254(d)(1)'s 'unreasonable application' clause, . . . a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." Id. at 411. A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." Id. at 409. The federal habeas court must presume correct any determination of a factual issue made by a state court unless the petitioner rebuts the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

The state court decision to which Section 2254(d) applies is the "last reasoned decision" of the state court. See Ylst v. Nunnemaker, 501 U.S. 797, 803-04 (1991); Barker v. Fleming, 423 F.3d 1085, 1091-92 (9th Cir. 2005). When there is no reasoned opinion from the highest state court considering a petitioner's claims, the court "looks through" to the last reasoned opinion. See Ylst, 501 U.S. at 805. In this case, the last reasoned opinion is that of the California Court of Appeal. (Ans. Ex. 6.)

The Supreme Court has vigorously and repeatedly affirmed that under AEDPA, there is a heightened level of deference a federal habeas court must give to state court decisions. See Hardy v. Cross, 132 S. Ct. 490, 491 (2011) (per curiam); Harrington v. Richter, 131 S. Ct. 770, 783-85 (2011); Felkner v. Jackson, 131 S. Ct. 1305 (2011) (per curiam). As the Court explained: "[o]n federal habeas review, AEDPA 'imposes a highly deferential standard for evaluating state-court rulings' and 'demands that state-court decisions be given the benefit of the doubt.'" Id. at 1307 (citation omitted). With these principles in mind regarding the standard and limited scope of review in which this Court may engage in federal habeas proceedings, the Court addresses Petitioner's claims.

///

C.  Claims and Analysis

As grounds for federal habeas relief, Petitioner claims that he was denied due process because the trial court improperly imposed consecutive sentences. Specifically, Petitioner argues that the trial court failed to cite all the necessary factors for imposing consecutive terms, and that the facts do not support the conclusion that there were two separate crimes rather than acts incident to a single objective. (Pet. Attach. at 17-18.)

The California Court of Appeal described the sentencing hearing as follows:

> The probation report identified eight aggravating factors: (1) the crime involved great violence and a high degree of callousness; (2) the victims were vulnerable, including young children; (3) the crime demonstrated planning and criminal sophistication; (4) the crime involved the taking of great monetary value; (5) [Petitioner] engaged in violent conduct indicating a serious danger to society; (6) he had a "horrendous" prior criminal record; (7) he had served prior prison terms; and (8) his prior performance on parole and probation was poor. (Cal. Rules of Court, rule 4.421.)
>
> [Petitioner] has a 24-year criminal history, having previously been convicted of the following felony offenses: robbery in 1985 (§ 211); assault with a deadly weapon in 1986 (§ 245, subd. (b)); vehicle theft in 1990 (Veh. Code, § 10851); possession of a prohibited weapon in prison in 1992 (§ 4502); possession of a controlled substance in 2005 (Health & Saf. Code, § 11377, subd. (a)); carrying a concealed dirk or dagger in 2007 (§ 12020, subd. (a)(4)); and possession of a controlled substance in 2009 (Health & Saf. Code, § 11350, subd. (a)), as well as six misdemeanors including drug and weapons offenses, a 1984 burglary (§ 459), and a 2008 domestic violence offense (§ 243, subd. (e)(1)).
>
> The court denied probation, for which [Petitioner] was presumptively ineligible (§ 1203, subd. (e)(4)), because he was an active participant in the robbery, perhaps even in a leading role, and was one of the three men who kidnapped the husband. Although [Petitioner] claimed he had only come to Laytonville to buy marijuana, the court noted that all of the robbers had pre-planned the home invasion at a motel prior to the crime, and [Petitioner] therefore knew in advance that he would be involved in criminal activity. The court also cited [Petitioner]'s long criminal history, as well as the fact that he was on probation when he committed the current offenses.
>
> . . .
>
> The court imposed the upper term of nine years on the robbery due to the "egregious" nature of the crime. The home invasion occurred during the evening meal time, when the

> perpetrators might have expected the whole family to be home. It was committed with small children present, and even if they did not view the ill treatment of their father, they must have heard and known what was going on. [FN4] The court noted the robbers "ransack[ed]" the house and "rough[ed] up and torture[d]" the husband. They used a firearm and at one point threatened to shoot him in the kneecap. They then engaged in separate criminal acts by taking the husband out to the woods to search for the money. The court called the crimes "heinous" and "frightening" and noted that the robbers showed "no regard whatsoever for the physical [or] psychological welfare" of the family members. In light of [Petitioner]'s prior record of convictions and history of failure on probation and parole, the court believed the upper sentence was appropriate on the robbery count and the two sentences should run consecutively.
>
>> FN4. The children were following their mother from their bedroom into the kitchen when the men grabbed her by the hair and threatened her with the stun gun. During the interrogation of the husband, the six-year-old kept asking what the men were doing to his father, which confirms the court's view that the children were aware of the mistreatment. Following the crime the family moved from the house and required counseling to help them recover from the events.

(Ans. Ex. 6 at 4-6, footnotes omitted.)

State sentencing courts must be accorded wide latitude in their decisions as to punishment. See Walker v. Endell, 850 F.2d 470, 476 (9th Cir. 1987), cert. denied, 488 U.S. 926, and cert. denied, 488 U.S. 981 (1988). Generally, therefore, a federal court may not review a state sentence that is within statutory limits. See id. However, the constitutional guarantee of due process is fully applicable at sentencing. See Gardner v. Florida, 430 U.S. 349, 358 (1977). A federal court may vacate a state sentence imposed in violation of due process; for example, if a state trial judge (1) imposed a sentence in excess of state law, see Walker, 850 F.2d at 476; see also Marzano v. Kincheloe, 915 F.2d 549, 552 (9th Cir. 1990) (plea of guilty does not permit state to impose sentence in excess of state law despite agreement of defendant to sentence), or (2) enhanced a sentence based on materially false or unreliable information or based on a conviction infected by constitutional error, see United States v. Hanna, 49 F.3d 572, 577 (9th Cir. 1995); Walker, 850 F.2d at 477.

Federal courts must defer to the state courts' interpretation of state sentencing laws. See Bueno v. Hallahan, 988 F.2d 86, 88 (9th Cir. 1993). "Absent a showing of fundamental unfairness, a state court's misapplication of its own sentencing laws does not justify federal habeas relief." Christian v. Rhode, 41 F.3d 461, 469 (9th Cir. 1994); see, e.g., Miller v. Vasquez, 868 F.2d 1116, 1118-19 (9th Cir. 1989) (whether assault with deadly weapon qualifies as "serious felony" under California's sentence enhancement provisions, Cal. Penal Code §§ 667(a) and 1192.7(c)(23), is question of state sentencing law and does not state constitutional claim).

The state appellate court rejected Petitioner's claim that the trial court abused its discretion in choosing to impose consecutive sentences.

> We cannot agree there was an abuse of discretion. (*People v. Bradford* (1976) 17 Cal.3d 8, 20.) The counts of conviction were the robbery of the wife and the kidnapping of the husband for robbery. The prosecutor told the court when it accepted [Petitioner]'s plea that a *Harvey* waiver was not necessary because the counts were all "transactionally related." (*People v. Harvey* (1979) 25 Cal.3d 754, 758 (*Harvey*).)
>
> *Harvey* held that counts dismissed by plea agreement generally may not be considered in determining the sentence for an admitted count. (*Harvey, supra*, 25 Cal.3d at p. 758.) It made an exception, however, where the dismissed counts were "*transactionally related*" to the counts of conviction. (*Ibid.*; see also, *People v. Calhoun* (2007) 40 Cal.4th 398, 406-408 (*Calhoun*).) "Hence, the *Harvey* rule 'must yield when its application would prevent a court from considering all the factors necessary to make an informed disposition of the admitted charge of charges.'" (*People v. Sturiale* (2000) 82 Cal.App.4th 1308, 1315.) Crimes are transactionally related if they involve "facts from which it could... be inferred that some action of the defendant giving rise to the dismissed counts was also involved in the admitted count." (*People v. Beagle* (2004) 125 Cal.App.4th 415, 421.)
>
> Here the prosecutor was correct that the dismissed counts for burglary, various forms of assault, false imprisonment, and child endangerment were all part of the same overall transaction that underlay the robbery and kidnapping of which [Petitioner] was convicted. Therefore, the entire factual scenario could be used by the court in determining the appropriate punishment.
>
> Precisely because of that transactional relationship, though, [Petitioner] claims consecutive sentencing was improper because the overall objective of both the robbery and the kidnapping was the same, namely to find and steal the money he and his comrades believed the husband had in his home as proceeds of his marijuana

growing business.

The "objective" of a crime, however, may be described broadly (e.g., stealing money) or more precisely (committing a home invasion robbery). The Supreme Court has cautioned against defining a criminal objective too broadly in this context. (*People v. Perez* (1979) 23 Cal.3d 545, 552.)

When [Petitioner]'s objective is described more precisely, it becomes clear there were two separate objectives involved in the two counts of which he was convicted. Though the acquisition of stolen goods or cash was the ultimate goal in both crimes, the defendants could have abandoned the robbery when the husband convinced them there was no large amount of cash in the home. Instead, they expanded and escalated their crimes by embarking on a new mission of forcing him to lead them to the stashed money. This separately and hurriedly hatched plan took them on two forays outside of the house, involved the use of additional force or threats of force, and led them to transport the man a substantial distance in their search for the cash. By expanding their intent from that of entering a house and conducting a strong-arm robbery to actually transporting the husband to a separate location where they ultimately found the money, they committed a crime separate from the home invasion.

The probation report recommended consecutive sentencing based on rule 4.425(a)(1), [footnote omitted] specifically that "[t]he crimes and their objectives were predominantly independent of each other," and because the "crimes involved separate offenses on multiple victims."

In imposing consecutive terms, the court stated, "I believe that these are sufficiently separate acts in that the robbery of [the wife] was in terms of personal property in the house. And the kidnapping of [the husband] was to remove him from the house and to steal the cash. I think under those circumstances they are not part of the same transaction. For that reason the Court will impose the terms as a consecutive rather than concurrent..." sentence.

We agree with the superior court that the two crimes of conviction were separate acts of violence with separate objectives (see rule 4.425)(a)(1) & (a)(2)), despite the fact that they were "transactionally related." Crimes that are "transactionally related" for purposes of the *Harvey* rule do not necessarily constitute an indivisible course of conduct so as to prohibit the imposition of separate sentences under section 654.

...

Even [Petitioner]'s own description supports the imposition of consecutive terms. He argues, "[T]he robbers entered the... home looking to rob the home. They believed that part of what they would find was a large amount of cash from [the husband's] marijuana cultivation business. It was only when [the husband] informed them that the cash was located outside the house that the robbery morphed into a kidnapping, i.e., the robbers did not enter the home with the

> intention of kidnapping [the husband]. It is clear from the facts presented that the kidnapping was an afterthought that developed when it was determined that the object of the robbery – the cash – was not located inside the house."
>
> This is precisely why consecutive terms were proper. [Petitioner] and his confederates thought about what to do when the money was not found in the house, and they decided to commit yet another crime. This "afterthought" was separately and consecutively punishable because it increased defendants' culpability and the risk and trauma to the victims.

(Id. at 6-11.)

The state court's rejection of this claim was neither contrary to, or an unreasonable application of, Supreme Court precedent, nor did it result in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d). First of all, Petitioner's argument that the trial court failed to state all the factors in support its reasoning for imposing a consecutive sentence fails to rise to the level of a constitutionally protected liberty interest. A federal court may not review a claim that a state court failed to state its reasoning for a particular sentence pursuant to state law when the sentence imposed was clearly within its discretion. See Cacoperdo v. Demosthenes, 37 F.3d 504, 507 (9th Cir. 1994) (failure to abide by state requirement that trial court state reasons for sentencing consecutively does not rise to level of federal habeas due process claim), cert. denied, 514 U.S. 1026 (1995); Branch v. Cupp, 736 F.2d 533, 536 (9th Cir. 1984) (same), cert. denied, 470 U.S. 1056 (1985). Secondly, there is no indication that the trial court imposed a term in excess of statutory limits because under state law, as interpreted by the state appellate court to whom this Court must defer, see Bueno, 988 F.2d at 88, it was well within the trial court's discretion to decide whether to impose consecutive sentences.

Lastly, after reviewing the evidence presented, including Petitioner's own version of facts, the state courts' conclusion that there were two separate crimes with two separate objectives was clearly reasonable: (1) the culprits entered the house in

order to rob the inhabitants, and (2) they then kidnapped the husband in order to retrieve the cash which was somewhere beyond the house. Petitioner may insist that the overall objective was to obtain the cash, but the additional steps him and his accomplices decided to take in order to retrieve the cash once they discovered it was not in the house admittedly went beyond what they had initially planned. See supra at 9. As the state appellate court found, the "'afterthought' [to kidnap the husband] was separately and consecutively punishable because it increased defendants' culpability and the risk and trauma to the victims." See supra at 10. This Court must presume correct any determination of a factual issue made by a state court, and Petitioner has failed to rebut the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). Accordingly, Petitioner is not entitled to federal habeas relief.

## CONCLUSION

After a careful review of the record and pertinent law, the Court concludes that the Petition for a Writ of Habeas Corpus must be **DENIED**.

Further, a Certificate of Appealability is **DENIED**. See Rule 11(a) of the Rules Governing Section 2254 Cases. Petitioner has not made "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). Nor has Petitioner demonstrated that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." Slack v. McDaniel, 529 U.S. 473, 484 (2000). Petitioner may not appeal the denial of a Certificate of Appealability in this Court but may seek a certificate from the Court of Appeals under Rule 22 of the Federal Rules of Appellate Procedure. See Rule 11(a) of the Rules Governing Section 2254 Cases.

The Clerk shall terminate any pending motions, enter judgment in favor of Respondent, and close the file.

///

IT IS SO ORDERED.

DATED: 7/29/14

EDWARD J. DAVILA
United States District Judge

UNITED STATES DISTRICT COURT

FOR THE

NORTHERN DISTRICT OF CALIFORNIA

ANTHONY MELENDEZ,

        Petitioner,

v.

OFFICER J. SOTO,

        Respondent.

Case Number: CV12-05413 EJD

**CERTIFICATE OF SERVICE**

I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Northern District of California.

That on 7/29/14, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office.

Anthony Melendez AA8160
California State Prison
Inmate Mail/Parcels
P. O. Box 4610
Lancaster, CA 93539

Dated: 7/29/14

Richard W. Wieking, Clerk
By: Elizabeth Garcia, Deputy Clerk